Michael Gould at all v. Mark Morgan at all. Good morning, your honors, and may it please the court, David Thompson for the plaintiff appellants. And with the court's permission, I'd like to reserve three minutes for rebuttal. You may. Thank you, your honor. In District of Columbia v. Howard, the Supreme Court summarized its analysis of the text of the Second Amendment as follows, quote, putting all these textual elements together, we find that they guarantee the individual right to possess and carry weapons in case of confrontation. So Heller, in its terms, states that there is a guaranteed individual right to carry. And that conclusion flows from the text of the Second Amendment. Can you stay with that for a second? Because you refer to, in the event of confrontation. Yes, your honor. But then later in Heller, the majority opinion says not just any confrontation, expressly says that. Oh, you can't carry it for any purpose in any manner. It just says not for any confrontation. It distinguishes, it suggests that your right to carry, to have for a confrontation, applies not just to any confrontation. It has to be law-abiding, responsible citizens. But Heller said what the difference, how we distinguish between what confrontations or anticipated confrontations might be and which aren't. Well, your honor, I believe this goes to some of the history that we may get into. And for example, the statute of Northampton from 1328. Isn't it rational to say that if you have some basis for a fear that you will get in a type of confrontation that you need some self-defense, that the instrument of self-defense, like you have a claim, should be there with you? But if you don't have any basis that you will be in that type of confrontation, then how are you linking up the carry outside the home to that situation? Your honor, I don't believe there is any historical law from the time of the founding that imposed on law-abiding, responsible citizens the need to prove to the government that they had some concern about their safety The default was that they were permitted to carry in case of confrontation. And the- So what would you have us make of the court's language that they're not referring to just any confrontation? What I would say, your honor, is that if someone is engaged in illegal conduct, if someone is trying to create a mob violence regime, if someone carries with an ill intent, this court in Renee E. said that, and cited the historical precedent from 1697 that saying firearms had never been entrusted to those who were not intending to preserve the public peace. So if someone has an ill motive, an ill design, and that's why they're going out to confront someone, then that would not be something that would be protected. But the language in Heller, not just any confrontation, that language doesn't appear in context to be referring to prohibited persons. Nothing in Heller limits the state from prohibiting certain types of persons from carrying. I think we all agree to that, that laws that prohibit domestic violence abusers who have been previously convicted for carrying guns, things of that sort. So I agree with Judge Piazza that not just any confrontation has to mean that there are some types of confrontation, regardless of the types of persons involved, that are not captured within the absolutely wide open language of Heller. And I'm struggling with the notion as to just what those confrontations are. Well, and so, your honor, you could have someone who had a right to have a firearm. They were not on the prohibited list of mentally ill or a felon. And yet, they have an ill design. They decide, I'm going to go and take vigilante justice. I'm going to break these laws, even though I'm entitled, because I haven't done that yet. And they have an ill design, an ill motive to create criminal conduct. And we see that in these statutes that say that you cannot ride to the terror of the people. And Heller said that those Northampton statutes meant dangerous and unusual weapons. So if you only have no ill design whatsoever, but they also have no fear of being assaulted in any way or anything, then does the right apply in that circumstance? Yes, your honor. The historical record is crystal clear that in that circumstance, the default is in favor of carriage. And if we look at the case in Georgia, the Nunn versus State, which the Heller majority said perfectly captured, perfectly captured the type of restrictive law that was like Heller and subject to categorical invalidation. There, Georgia said, you can carry the long gun, but you can't carry a pistol. And that was struck down. And the Heller majority said, that opinion perfectly captures the right. Of course, the Massachusetts statute we're concerned with here is not a categorical ban. It provides open opportunities for people to be able to carry. It simply requires them to offer a good reason. And we're not dealing with an allegation that Massachusetts is applying the good reason standard in an arbitrary or capricious manner. And we're dealing against a historical background in Massachusetts that's rather different from that in Georgia. One of the problems with the whole use of historical analysis here is that historical analysis depends in large part on which part of the country you're looking at. Because the historical background of firearms stores in New England and the mid-Valentine states, or colonies as they were in the time, is rather different than the historical background as it appears when you look at the antebellum south. Well, Your Honor, you've made two points. And I'll try to briefly address them both, if I may. Number one, as to whether it's a flat ban, the DC Circuit looked at a similar law in Wren and concluded it was a flat ban for law-abiding, responsible citizens. Yes, and two or three circuits have looked at similar bans. And the client decided that it wasn't. So one thing that's clear from our historical background is that there are mixed reviews on highly analogous questions on the courts of appeals. Your Honor, on your second point about the regional variation, the laws that they cite to, these Northampton analogs, were in Virginia, North Carolina, Tennessee. So it is simply not true, well, that the South had one type of regime and that the North had a different type of regime. And I'd like to save my time for a bottle, if I may. Good morning, Your Honor. And may it please the court, my name is Matthew McGarry. And I represent Police Commissioner William Evans in this case. Your Honor, appellees have segmented our oral argument into three portions. Briefly, I'm going to make the point that Wren, Moore, and Young are rarely distinguished here. And then time permitting, urge the court to adopt the two-part framework that other circuits have adopted. Then Mr. Taylor will explain why the policies here are consistent with the Second Amendment under the first prong of that test, the historical prong. And then Mr. Casey will sum up with a broad roadmap of the case and address the second step, which is tiered scrutiny. So, Your Honor, Wren, Moore, and Young are rarely distinguished here because they depend on finding that the laws and policies at issue were complete bans on carrying outside the home. In the Young case, which just came down yesterday, the court looked at a proper purpose standard under which no licenses had ever been issued. And the opinion rested on a conclusion that that provision, along with another, amounted to a complete ban. And the opinion explicitly distinguished proper cause standards like the one at issue here. In Moore, it was very similar. What was being analyzed was a law that was, as to the plaintiffs, a flat ban on carrying outside the home. Is it fair to say that, in practical terms, what the message of the law means, though, as employed in the defendants in this case, is that the roughly 90% of citizens, or the overwhelming majority of citizens, it is a complete ban except for sporting or shooting purposes? Well, I disagree in the case of Boston, Your Honor. And let me explain why. So, Your Honor, Boston and Brookline's policies don't amount to a complete ban. As plaintiffs admit, in the case of Boston and, similarly, Brookline, one in four ordinary citizens, as they call them, receive these unrestricted licenses to carry under the policies. The Boston plaintiff's licenses permit them self-defense in the home, target shooting and hunting, travel to and from those activities, and, in each case, they can carry open or conceal. With a very slight difference, Brookline's policy is similar. And Mr. Gould's license allowed him to carry for every purpose that he sought. Now, in Renee E., this court declined to treat a federal law, with similar exceptions, as a complete ban. And I would wish the court to adopt that same logic here and distinguish more Ren and Young from the instant case. Your Honors, I would also urge the court to adopt the two-step approach that's been adopted by every other circuit that's considered this issue. Heller did not apply, but explicitly contemplated tiered scrutiny. And moreover, that two-step test, that two-step inquiry, is consistent with this court's own precedent, taking Renee E. as sort of the first prong of the test and taking the United States versus Brooker as the second prong. So Your Honors, once the court has any questions, I'm going to turn things over to Mr. Taylor. Thank you. Thank you, and may it please the court. Jonathan Taylor for Police Chief Morgan in the town of Brookline. As my colleague noted, I'd like to say a few words about the history this morning. But I would like to emphasize, just as a predicate to my argument, what this case is not about. This case is not about whether the right to keep and bear arms is confined to the home under Heller. That is not our position, and this court certainly need not adopt that position to rule in our favor here and uphold to the regime that has been challenged. And that's because, as my colleague began his argument by noting, the regime challenged here allows people to carry firearms outside the home under a number of circumstances, as the plaintiff's own experiences illustrate, while restricting public carry to those circumstances. And so the question at step one of the inquiry, then, is whether those restrictions find sufficient support in our tradition and history to be deemed longstanding and thus constitutional under Heller and this court's precedents. And the answer to that question is yes. And our brief says a lot about why the answer is yes. It lays out in detail the 7th century Anglo-American tradition of public carry restrictions. And I have neither the time nor the desire to repeat all of that here, but I do want to emphasize just one thing, if I may. The other side works really hard to convey the impression that all of the history that we discuss in our briefs and that our amici discuss in their briefs supporting us, and every historical law and all the contemporaneous sources are hotly contested and open to debate. And that's simply not true, even if you credit the other side's alternative version of the English history and the early American history. And if I have a minute at the end, maybe I'll explain why I think they're wrong. But it's still the case that there are over a dozen state laws and over a dozen municipal ordinances from the mid to late 19th century and early 20th century that were at least as broad as the regulation you have before you today. Yeah, but the problem of the struggle I'm having with this is my preliminary research indicates that that's true. But there are also probably an equal number that would support your brother's position. And it depends if I'm looking at Tennessee cases or Georgia cases or Massachusetts or New York. Well, that's true. And yet I know that the Second Amendment is a constitutional provision, so there's got to be a national standard. And that's why I find the history so problematic, because it seems to vary regionally. Well, I would just emphasize that the Second Amendment, you're right to note, is a federal standard. It just sets the floor. And then states or particular regions of the country are free to be more permissive than that. And our country has taken advantage of that. It's one of the benefits of a federalist system. But I would just note that when this court confronted the juvenile prohibition in Rene E, it just identified eight or nine state laws from the late 19th century and early 20th century that operated as similar prohibitions. And then it recognized that because of that, there was a sufficiently longstanding tradition to sustain the law. And I would just urge the court to adopt a similar approach here, even without having to get into the nitty-gritty details of the statute in Northampton or the Americanized version of it. Because I think what the tradition shows is that there have long been reasonable and heavy regulations on public area outside the home, and that even as to the particular regime at issue here, a number of states for over a century have adopted similar prohibitions, and that that should be recognized as longstanding. The Third Circuit in Drake recognized it as longstanding as an alternative holding, and this court should adopt the same approach here. Thank you, counsel. If there are no further questions. Good morning, your honors. And may it please the court. Tim Casey for the Commonwealth. With the court's permission, I'd like to use my limited time to urge the court not only to uphold Boston and Brookline's implementation of the Massachusetts Licensing Statute, but also respectfully to urge the court to decide the case in a particular way.  that the Massachusetts licensing statute is a violation of the United States Constitution. First, that Boston and Brookline's licensing policies are part of a longstanding and thus presumptively lawful regulatory tradition that renders them presumptively lawful. Second, I urge the court to also conclude that even if these policies burden Second Amendment rights, because they are substantially or reasonably related to the undeniably compelling governmental interests in crime prevention and violence reduction, they survive heightened scrutiny. That sounds to me like you're arguing for intermediate scrutiny. Yes, your honor. We're urging the court both to conclude that it's presumptively lawful and that it would. I understand your historical point. But there is some controversy about if we reach the Second Amendment, if we have to test the constitutionality of this regulation, there is some question as to what our level of scrutiny should be. And it sounded to me like your argument was an argument for intermediate scrutiny. It is, your honor, based in part on this court's decision in Booker, where the court, without calling it by name, applied something akin to intermediate scrutiny. And it's consistent with, I think, what every other circuit court has done in the vast majority of these types of gun regulation cases, which is to apply intermediate scrutiny. We've done that, and we do the public policy analysis that you're suggesting as we look at the public interest here. Do we require any degree of empirical support for the assertion of that interest by either side? Then you have one basically saying that if people carry guns, there's not going to be any more crime or shooting. And the other saying, we're afraid that if you have a lot of guns out there, there'll be more shooting. Do we just say the legislature gets to pick either one of those, period, under intermediate scrutiny? Or do we say there needs to be some empirical basis? For example, we have a number of states that have only carried. There are more shootings per person there than otherwise. Your honor, I suggest that. Or do we say that the legislature has well considered the policy, and we owe deference to that? Your honor, respectfully, you definitely should say that deference is owed to the predictive judgments of the legislature under intermediate scrutiny as articulated by the US Supreme Court in the Turner and the Turner II decisions, for example. And in fact, the Supreme Court in those cases referred to the judgments of the legislature being supported by substantial evidence, a well-defined term in administrative law, which specifically noted was even a more deferential form of substantial evidence than it would apply to decisions by administrative agencies, because it's a legislature reflecting the will of the people. So intermediate scrutiny can and should be a way to test the government, to put it to its proof in terms of not judicial proof, but it that it's furthering an important governmental interest and that its law either reasonably or substantially furthers that interest. Here, as you know, we assert that the evidence overwhelmingly supports a conclusion that a measure like this saves lives. We believe emphatically that it is part and parcel of the reason why Massachusetts consistently has the lowest or near the lowest rate of gun deaths among the 50 states in the country. But even if the court were to find the evidence to be equivocal on that point, the deference it owes to the predicted judgments of the legislature under intermediate scrutiny, we suggest would require the court to uphold the law under intermediate scrutiny. Thank you, Your Honor. So Hawaii said it was the lowest, but that didn't seem to be persuasive yesterday. It did not, Your Honor, based on the Ninth Circuit panel's 2-1 decision treating Hawaii's law as effectively an outright ban. And the record in that case suggested that because the record revealed that no one had been issued a concealed carry permit and that only, essentially, security guards whose duties required them to protect life and property were issued public carry permits. That case looks much more like the Seventh Circuit's decision in Moore against Madigan, which was undeniably an outright categorical ban on public carry. As Judge Selly pointed out, this is not a categorical ban. This allows for public carry for specified purposes. It also recognizes the self-defense interest in carrying a weapon. It simply asks applicants to demonstrate to law enforcement officials in these localities that they have a demonstrable, specific reason to carry a firearm in public based on the public safety harm that that presents. Thank you. Thank you, Your Honors. Your Honors, I'd like to make six quick points, if I may, during my three minutes here. Number one, with respect to Wren, it's the same regime. The court has to decide whether it finds Wren persuasive, but it's the same regime, number one. Number two, we're told that it's not a flat ban because 25% of those who apply get a permit. The fact that Boston gives lawyers and doctors these permits is of very little solace to the rest of the population. It's not outright, not only because 25% get full permits, but by an even greater percentage, as I understand it, get permits. But they're permits that are limited, often in accordance with the purposes that are specified by the applicant. It's a flat ban, Your Honor. It's sort of as though Boston said, you can talk about sports and economics and religion, just not politics. In other words, the core of the right is to be able to leave your home with your family and protect yourself and your loved ones going for a walk or your daily routines. And they said, no, they flipped the sensitive place on its head. The teller said that there might be some sensitive places like courthouses where guns can't go.  then you can't go out on the streets with a gun. And by the way, Massachusetts goes our way, not their way, because 92% of the people in this state who apply get an unrestricted permit. They can come into Boston if they want. They can go into Brooklyn if they want. But the people who live in Boston, who aren't lawyers and doctors, they cannot carry. So Massachusetts actually has a very permissive regime that goes our way. It's just Boston and Brooklyn that have this restrictive regime. They say, Mr. Taylor says, in this case, we don't have the question of whether there's a right that extends beyond the home. Make no mistake, their historical rendering would confine the right. It would leave the word and bear out of the Constitution. So if you accept their history, it would follow that they're leaving the right to carry out of the Constitution. There was a question, Judge Say, about the regional variations. Delaware, Maryland, New Jersey, New York, North Carolina, Tennessee, Virginia, basically every region of the country at the time all had a Northampton analog. And every single one of them subsequently passed a concealed carry ban. What does that tell us? That tells us that their version of history can't possibly be true. It can't possibly be right that it was a flat ban, these Northampton analogs. Because if there were, why would you subsequently go and say, oh yeah, and by the way, there's another thing you can't do, which is concealed carry. So their version of history in every part of the country doesn't stand to scrutiny. And finally, on deference. Deference, I know I only have a few seconds, but if I may just address one last point. The question of deference came up. And deference would be inappropriate to the legislature here, because number one, in Heller, the District of Columbia brought an enormous amount of statistical evidence to the Supreme Court. And it rejected it, saying some policy decisions are off the table. In the same way that Massachusetts came to this court and said, we have studies showing that the exclusionary rule revoking it will save lives. This court would reject that. It would not defer to it, because the Constitution takes that off the table. Likewise, we reject the idea that intermediate scrutiny should apply. But if it did apply, we would ask the court to look at United States versus Virginia, the VMI decision from 1996, where the Supreme Court did not defer to the judgment of the state of Virginia, but rather did a probing inquiry, as Judge O'Scallion said yesterday. And Turner, in intermediate scrutiny, they did 20 pages of analysis. This goes, Judge Keada, to your point of, well, how much statistical evidence is needed? And it is a substantial burden that they bear. And if we look at the only two studies that have looked at the entire category, the whole waterfront of studies, they're the CDC and the NRC. And they say there is no way to conclude that permissive carriage laws, in any way, are a threat to public safety. And one last thing I would say, and this is really important. Under intermediate scrutiny, How do you assume that everything else you've said isn't important? And it's this, which is all of the public safety benefits that they try to access depend upon suppressing and limiting the right to carry. And it's all premised on reducing the amount of carriage in public. And they say, if we do that, we will get all these benefits. And what the Alameda County book case shows is government cannot target, either with a purpose or effect, the exercise of the right to access secondary benefits. So it's an impermissible mechanism that they are relying on for the health benefits they claim to be achieving. Thank you, Your Honors.